Chisholm, the appellate in this matter. I'd like to reserve four minutes for rebuttal purposes. Alright. It's an important pleasure. Your Honor, this case is about the breach of a storage contract. My client, R.A. Chisholm, had a contract to store frozen meat products with the American Cold Storage defendants in Louisville, Kentucky in 2008. During that same period of time, my client also had a production of meat products from wholesale meat products with Abilene Texas Foods, which I refer to as ATX. The way this arrangement worked was that ATX would take Chisholm's raw meat products, process those meat products into final products that could be sold to restaurants. Those products would then be stored at American Cold Storage's facilities in Louisville, Kentucky. And then at some point during that process, whenever ATX desired to have those products released and then sold to its customers, what it would do initially is that it would request that R.A. Chisholm provide a release authority or authorization to ACS so those products could be acquired by ATX and then sold. The question in this case is, and it specifically writes to paragraph seven in the cold storage contract between my client and ATX, that question would be whether or not my client gave written authority to ACS to release these products. The ACS witnesses have testified in the case that in all instances, this written authorization was required as a predicate for release. The trial court found, granting summary judgment in ACS' favor, that this release was given to ACS by my client as a result of two emails that occurred during the discourse about a the acquisition of inventory information. I'm going to touch on the standard of care that applies here. This is unfortunately or fortunately, depending on how you would look at it, a case that doesn't really turn on the issues related to complex interpretations of the law. The law here is pretty simple. The issue turns upon whether or not the court could properly draw an inference from the testimony about the conversation that occurred here and determine the party's intent with regard to whether or not the product should be released. But the standard of care is found within KRS 355, 7204, subsection 1. Standard what? KRS 355, subsection 7404, subsection 1. Is this a standard of care for Baileys or what standard of care for who? It's a standard of care for Baileys. Thank you. What are you referring to? I'm sorry. I'm sorry. Kentucky Revised Statutes, chapter 355, section 7-204, subsection 1. Basically it says a warehouse is liable for damages, for loss or injury to the goods caused by its failure to exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances. Our submission is that the reasonableness of what ACS did in these circumstances is a jury issue. I'm going to read the email that my opposition... I want to ask you a question. Why, when you start talking about intent and what was her intent, I mean I felt as though, like why are you talking about the, why would her testimony regarding her intent matter when you have this email trail? Well her testimony about her intent is significant. It is directly in contradiction to their interpretation of her intent through that email. I know, but shouldn't we just look at the emails and see what they said? Honestly, my reading of the emails is that she did not give them clear permission to do so. She did not give them clear permission to release the inventory. But I wonder why we would ask somebody what their intent is when the case should be decided based on the communications back and forth. And I would agree with Your Honor in that assessment. I think the bigger issue of intent here and which was overlooked by the trial court is that through this discourse, through this conversation among all the parties, it is clear that the intention of my client was to release information about inventory to ACS as opposed to actual product. Releasing product without written authorization wouldn't make any sense because that's transfer of title and my current client is not going to authorize that or wouldn't wish to have that on a carte blanche basis and that would be completely inconsistent with ACS contractual obligations and statutory obligations to my client to allow that to occur. The primary email, and there are two, that the opposition... Before you get to that, because the emails are in there, what does the record show, the record now, not what your own knowledge is, but was ACS aware of the financial problems going on between Abilene and Chazon? I don't believe so, Judge. I don't believe the record clearly shows that ACS had awareness that may have been in the penumbra of the communications. That would obviously be an issue we wish to develop at trial and would have a bearing upon ACS understanding of the purpose of this discourse that occurred here. You're not claiming that they knew about the financial problems? Not claiming at this particular point. You're relying on the exchange of emails that, what's her name, that Corey De La Fuente participated in. Yes, there are actually four players in this process. One is Ryan Rinaldi, who is the logistics coordinator for ATX. Corey Fuente, who you mentioned, was the office manager for ACS. Jackie Cray was my logistics manager for my client. The third party, fourth party involved was Melody Young, who is the customer service relations person employed by ACS, who had been responsible for the determination of what should be released. I'm sorry, who's that? Melody Young is her name. Ms. Young, as mentioned in the email chain that's found at record 78, pages 1539 through 1549, the email chain that I'm about to talk about. I didn't want the court to be unfamiliar with who the parties are. The primary email that they rely upon is dated September 29, 2008, at 8.30 a.m. It's from Ms. Cray, my client's representative, to Ms. Fuente, ACS. Ms. Cray says, Abilene, Texas Foods is allowed to have access to Chisholm's inventory and paperwork until further notice. If you have any questions, please contact me. Otherwise, please forward the paperwork to Ryan when requested. Now, the significance of this is this email occurs at the end of a conversation that actually began on September 25, 2008. In the morning on that date, Ms. Ronali, who is ATX logistics person, asked Ms. Fuente for a copy of the Chisholm inventory so that she would have some kind of idea of what meat would be available for processing. At approximately 9.37 a.m., Ms. Ronali writes to Ms. Fuente and she says, Cory, I only got two pages of inventory. Is this for Chisholm and Abilene or just Abilene? I need the Chisholm inventory. Thanks. The significance about this particular communication is that she's using the same language that the court and my opposition are relying upon. She's asking for the Chisholm inventory. But it's apparent through the conversation that occurs and the discourse that occurs thereafter that what she's actually asking for is a copy of the information about inventory that Chisholm has on file with ACS. She's not actually asking for the inventory itself. The conversation goes on and then at the end, Jackie Craig communicates with Ms. Fuente and she says, Cory, please give Abilene a copy of Chisholm's inventory. Again, that's evidence of the intent of the parties involved here. They are talking about the release of information. They are not talking about the release of product and a transfer of title from Chisholm to ATX. The second email upon which my opposition relies occurred on October 6, 2008 at 9.35 a.m. and it's an email from Ms. Craig to Ms. Fuente. And it says, confirming, this is Jackie have access to our inventory including warehouse receipts and withdrawal notices. And that conversation, that email is preceded two business days by an extended conversation in the record that the court is familiar with that deals with ATX request for access to VIAVIEW. VIAVIEW was a computer system maintained by ACS through which Abilene Texas Foods could acquire information about Chisholm's inventory at ACS storage facilities. On October 30, in the morning, Ryan Rinali asks Ms. Young, may I have access to VIAVIEW for Chisholm? And then Ms. Fuente talks with Ms. Young about that. Ultimately, Ms. Fuente says to Ms. Young and to Mr. Rinali, we will need to get Chisholm a login and password and then we'll have Chisholm decide what specific information they want Abilene to have access to. It shouldn't take long. Then there's a discussion about who to talk to and ultimately Jackie Cray's name and number are given and there's a conversation that occurs about the release of information to ATX. On the following business day, which was a Monday, the previous day being a Friday, there's another conversation in which Ms. Rinali starts again with Corey, can I have the info for VIAVIEW for Chisholm? And Ms. Fuente says, Ryan, Chisholm wants you all to have only inventory access. We have to set that account up with limited access. Again, Ms. Fuente in this instance is using the exact same language that the court relied upon and my opposition relied upon that Ms. Cray used in her October 6, 2008 email to us. But what she means isn't a transfer of title to property, what she means is a transfer or allowance of information about Chisholm's property to ATX. Our position is that after these two emails, ACS released our property to ATX without authorization. How long did they immediately ask for meat that they, was this immediate that they started releasing their meat to them? It's our belief and the record would show, Judge, that that release began to occur approximately 30 days after the final communication and it continued through May of 2009, at which time a bank audit was performed after an ammonia spill at ACS' facilities and the discrepancy between Chisholm's inventory and the inventory maintained by, information maintained by ACF was discovered. I see that I'm out of my time and I'll pass the podium to Mr. Horvath unless there are any further questions. Thank you. Please, the court, John Horvath representing the Appalachian Police. Intent is not an issue here. What is at issue is the understanding of ACS when it received the emails in question. Well, they have to be reasonable. Yes, Your Honor, and they are reasonable. I don't see how any reasonable person could read this email exchange and conclude that it could only mean one thing. Your Honor, the first email in question is one dated September 25, 2008. And in that, that was an email from Jackie Cray at Chisholm to Corey Dela Fuente at ACS. And in that email, with a cc to Ryan Rinali at ATX, in that email, Jackie Cray tells Corey to please give Abilene a copy of Chisholm's inventory, a copy of Chisholm's inventory, a document. The next email that's relevant is an email dated September 29, 2008 from Jackie Cray, again Chisholm, to Shannon McCune and Corey Dela Fuente at ACS. In that, she says, Shannon slash Corey, Abilene, Texas Foods is allowed to have access to... Wait, wait, wait. Let's talk about the one that comes right after the first one. Corey, I only got two pages of inventory. Is this for Chisholm and Abilene or just Abilene? I need the Chisholm inventory. Thanks. That's... Then it says from Corey, Ryan, I need a written release from Chisholm allowing me to give you their inventory information, please. Then you have Jackie saying, I'm trying to make sure inventory is correct on our end. Can you please provide Corey with the following information below? Then, Corey says, then Jackie says, please give Abilene a copy of Chisholm's inventory. Yes, Your Honor. Okay. Well, I think you should read the whole exchange because it does provide context. It certainly does and the context culminating in the instructions from Jackie Well, let's keep going. Please advise when the above order will be ready to ship. I will check with storage to see when it will be ready. Is there any way you can send an email to Corey stating we are allowed to get copies of the paperwork for Chisholm so that we do not have to go through this every time I need an inventory or withdrawal paperwork? Thanks. She does. Corey, Abilene, Texas Foods is allowed to have access to Chisholm's inventory and food until further notice. If you have any questions, please contact me. I mean, don't you have to read that in context? Yes, Your Honor. In reading it in context, there is a distinction in the September 29, 2008 inventory at 8.31 a.m. between the inventory, and the inventory is the meat. That's what ACS is storing, meat, and paperwork. Paperwork is all of the documentation, including copies of inventories. And to show what Jackie Craig meant by access to, she said, please forward paperwork to Ryan. Let me ask you this question though. This whole discussion kind of illustrates, this discussion is about intent and understanding and whatnot, but when you get right down to it, in order for you to prevail today, don't we have to agree with Judge Simpson that no reasonable juror could have found this exchange of correspondence ambiguous? Yes, Your Honor, I believe so. That's a tough hurdle it seems to me. Looking at the emails on which the judge relied, it is clear, and also looking at it in the context of the September 25 email, in which Chisholm clearly made a distinction between inventory, meat, and a copy of the inventory, it's clear that the September 29, 2008 and October 6, 2008 email instructions to ACS were clear and unambiguous. Release the inventory, the meat products, to ATX as it requests. If Your Honors have no further questions, I just ask that Your Honors affirm the trial court's finding. Which is the second email you're relying on? I'm sorry. The second one is the October 6, 2008 at 9.35 a.m. It's from Jackie Cray to Corey Dela Fuente. Okay, thanks. Thank you, Your Honor. Thank you. Any rebuttal? Your Honors, I would submit that the fact that we disagree demonstrates the ambiguity that would lead to a conclusion that a jury should consider this. When there are issues of intent, when there are communications that differ or interpretation of those communications differ, a jury should determine what that intent and what those communications should mean. I would disagree that the September 29, 2008 and the October 6, 2008 communications from Ms. Cray to Ms. Fuente are ambiguous. In fact, they are very clear. Ms. Cray, when these conversations are placed in context, was indicating to Ms. Fuente that Chisholm was authorizing ATX to have access to information about its products stored at ACS Warehouse. It was not indicating that it intended to transfer title to this property, to ATX. I would also point out to the Court that the extended communications that I quoted from earlier that occurred on October 3, 2008 were overlooked by Judge Simpson. Respectfully, I don't think that he considered the entire record with regard to his conclusion about the intent and purpose of the October 6, 2008 exchange between Ms. Cray and Ms. Fuente. We believe that reasonableness is an issue that should be determined by a trier of fact. Under these circumstances, it was not reasonable for ACS to release Chisholm's property to ATX. We respectfully request that the Court reverse the Court's summary judgment and return this case for trial. Counsel, have you all had any settlement discussions or would you be interested in talking to our court's mediation office? Has that subject matter come up between you? We have had mediation before Judge Moyer and the Trump Court. We also had a truncated mediation discussion for this Court's mediation service. Those conversations were not fruitful.